UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

IN RE:

KEVIN FRANCIS JAMES                              Chapter 7

    Debtor.                              Bankruptcy No. 06-00118S


MEMORANDUM DECISION:
U.S. TRUSTEE'S MOTION TO DISMISS CASE

    Habbo G. Fokkena, the United States trustee, moves to dismiss this chapter 7 case for abuse. Kevin F. James, the debtor, objects. Evidentiary hearing was held June 13, 2006 in Sioux City. John F. Schmillen appeared as attorney for the U.S. trustee. Donald H. Molstad appeared as attorney for James. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

    James is employed as terminal manager for Jebro, Inc. He is 34 years old. His employer manufactures and distributes petroleum and chemical products used primarily in the road construction and maintenance industries. Jebro was formerly a locally owned business, but was purchased in 2005 by MDU Resources Group, Inc. to be operated as part of Knife River Corp. Jebro gave its employees a one-time longevity bonus based on each employee's years of service. James had been with the company since October 1993. James received a longevity bonus in the gross amount of $20,000.00 on or about September 30, 2005. By December 7, 2005, he received also a year-end bonus of $2,500.00.

    From the longevity bonus his employer deducted $4,800.00 in federal income tax withholdings, $960.00 in Iowa income tax withholding, $1,530.00 for social security withholdings, and

$800.00 as a contribution to James's 401(k) plan. The net payment to James was $11,910.00 (exhibit I). The 401(k) plan contribution was not mandatory.

James does not recall the net amount paid to him from the annual, year-end bonus. Based on his payroll statements (exhibit A), I estimate that he received at least half of the bonus as net pay after deductions.

James says that on average he works about 45 hours per week for $19.35 per hour. He receives time and a half for overtime. His earnings statements for the weeks from March 8, 2006 through May 28, 2006 show that he averaged 55.27 hours per week (exhibit A).

James's wife, Therese, did not file a bankruptcy petition. She has heart problems, and suffered a heart attack two and a half years ago. She was employed from 1998 until May 2005 as a customer service representative for MCI. She then worked for Qwest for four and a half months. After that she had some self-employment, and she has worked part time for a bowling alley/ entertainment center. She has had earned income as recently as May 30, 2006. Her paycheck from the bowling alley showed net income of $112.62 for a two-week period. The couple has no children.

James's bankruptcy schedules show that he has two secured debts. He owes Sun Trust Mortgage approximately $71,763.00 on a mortgage debt against his home. He values the home at $76,000.00. He owes Siouxland Federal Credit Union approximately $20,777.00 on a car loan. The loan is secured by a 2003

2

Chevrolet Z71 Silverado pickup truck valued by James at $16,500.00.  He has reaffirmed both debts.  His schedule of creditors holding unsecured nonpriority claims shows eight creditors, six of which are credit card lenders.  One creditor was a furniture vendor, another was a cell phone service provider.  The aggregate unsecured debt listed by James was $24,165.22.  It appears that nearly all the unsecured debt was incurred prior to James receiving his longevity bonus.

By the time he received the longevity bonus, James and his wife were having financial problems.  One creditor had obtained a judgment against him and had garnished his wages.  He first contacted an attorney about filing bankruptcy in October or early November 2005, after he had received his longevity bonus.  He was told that the attorney was not interested in his case because of the nature of her practice.  He contacted Donald H. Molstad around January 1, 2006.  James filed his chapter 7 petition on March 3, 2006.

James has a savings account but not a checking account.  He deposited the net proceeds of his longevity bonus in his savings account.  He withdrew $7,500.00 in cash.  He spent the money in a variety of ways.

Part of the money was spent on increased living expenses.  James's mother, her husband, and James's sister's two juvenile sons moved in with James and his wife at the end of 2005.  The nephews are ages 4 and 6.  One has disabilities.  The four family members stayed for two two-month periods.  James testified that he believes he spent an additional $150-$200 per week on

3

groceries during that time, plus the additional costs of water and other utilities. He said his mother's husband obtained a job with an equipment manufacturer located in Onawa; James helped him with gas money for his commute. James did not seek reimbursement from his family, and they made no effort to repay his extra expenses.

James did not use any part of the longevity bonus or the year-end bonus to pay existing debts. He said he made up his mind he couldn't pay his debts, and he decided to "treat" himself, to "reward" himself, in spending the bonus.

He purchased a new dog kennel for his Labrador retriever. It cost approximately $600.00. He bought a black powder muzzle loading rifle for $235.00, a bowling ball and bag for $200.00, hunting boots for $180.00, a shock collar for his dog for $150.00, a snowblower for approximately $535.00, a wheelbarrow for $60.00, a shop vac for $60.00, and new washing machine and clothes dryer for approximately $600.00. Also he purchased Christmas gifts for the nine adults and six children in his family. James also took a trip to Chicago with friends to watch the Chicago Bears football team play the San Francisco 49ers. He said the trip cost him about $800.00. He also paid his attorney's charges for bankruptcy representation. The attorney disclosed receiving compensation in the amount of $1,174.00. James said the remaining bonus money was spent on everyday living expenses.

The evidence shows significant medical bills for 2006. The couple has health insurance through his employer. James pays

4

$394.83 per month for the coverage, which is deducted from his pay (exhibit 6). James is responsible for some of the post-petition medical costs under his insurance plan.

James received a federal income tax refund for 2005. He received it in February 2006. He does not recall the amount of the refund. He spent it on "living expenses." James is an individual with primarily consumer debts.

The U.S. trustee moves to dismiss James's chapter 7 case under 11 U.S.C. § 707(b)(1), contending that granting relief to the debtor would be an abuse of the provisions of chapter 7 of the Bankruptcy Code. The U.S. trustee concedes that because the longevity bonus was a one-time event, a presumption of abuse does not arise in this case under 11 U.S.C. § 707(b)(2)(A)(i). The U.S. trustee bases his motion on 11 U.S.C. § 707(b)(3) which states that--

> [i]n considering under [§ 707(b)(1)] whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in [§ 707(b)(2)(A)(i)] does not arise or is rebutted, the court shall consider-
>
>> (A) whether the debtor filed the petition in bad faith; or
>
>> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

In bankruptcy cases filed on or after October 17, 2005, there is no longer a presumption in favor of granting the relief requested by the debtor. See § 707(b)(1) as amended by BAPCPA,

5

Pub.L. 109-8, § 102 (April 20, 2005). Also, Congress in BAPCPA reduced the test for dismissal from "substantial abuse" to "abuse." Id.

I find and conclude that granting relief to James under chapter 7 would be an abuse of the provisions of chapter 7. I consider the totality of the circumstances in this case. I find that James did not file his chapter 7 petition in good faith.

I consider an abuse to be a misuse of the bankruptcy provisions, to use them wrongly or improperly. I consider that bad faith has taken place when a debtor files a bankruptcy petition with motives that lack honesty of purpose or fair dealing. James acted in such a way.

In September 2005, James owed approximately $24,000.00 in unsecured debt. At the end of September he received an $11,910.00 net payment from a longevity bonus. This amount represented nearly 50 percent of his debt. By the end of the year he received an annual bonus in an amount I estimate at $1,250.00, and in February 2006, he received a federal income tax refund in an amount he does not recall. Instead of devoting any of these funds to the payment of his debts, he spent it all. Many of the expenditures were for luxury items or for gifts to family. While he was spending the money, he was searching for an attorney to represent him in bankruptcy. He did not believe he could pay his debts and wanted relief. Instead of paying something toward his debts and working out a plan, in or out of bankruptcy, to pay the remainder, he decided to himself. Much of the money was spent, not on critical costs of living, but on

6

luxuries and gifts. When James received his bonuses, his finances were not beyond repair. He made them so by being recklessly wasteful, at the expense of his creditors.

I recognize that he did not incur new debt as part of his pre-bankruptcy buying and that his present need for bankruptcy may be real, especially because of the couple's medical expenses. Also no one has contended that his schedules were inaccurate. But these factors are not sufficiently mitigating on the issue of bad faith.

James defends the motion by admitting that what he did was immature and that many, but not all, of the expenditures were frivolous. But, he argues, frivolous spending cannot be the standard for bad faith, because if it were, many improvident debtors would be denied protection in bankruptcy. James asserts that bad faith connotes a calculated, intentional design to harm creditors, not merely lavish spending on the eve of bankruptcy.

I disagree. To be sure, many debtors spend unwisely as they descend financially into insolvency. But that does not mean each is doing so with an eye toward discharging his unpaid debts. Moreover, James's spending did not lack the element of calculation. He testified that as opposed to paying any of his debts, he chose to enjoy the bonus money as a reward. He chose this use of the money at a time when he was contemplating bankruptcy.

James argues also that he could have transferred the money into exempt assets such as cash value life insurance or an individual retirement account, and likely no one would have

7

complained.  Instead he made purchases that did him little if any long-term good.  It is true that he could have made better purchase choices that could have fallen within Iowa's exemption statutes.  But such statutes are intended to recognize the need of debtors to own certain types of assets to preserve their livelihoods and their dignities, not the need for any asset a debtor chooses to buy.  Moreover, these exemption statutes do not permit unlimited purchases of such assets just before bankruptcy.  Iowa Code §§ 627.6(8)(f)(6) and 627.6(6).

James's payment of a significant part of the bonuses to creditors might have made a subsequently filed chapter 13 plan feasible.  Instead he spent the money on himself.  This ensured that the chapter 7 means test would not require dismissal.

In summary, I find and conclude that spending significant cash assets on unnecessary luxury items with an intent to file bankruptcy and discharge existing indebtedness is bad faith within the meaning of 11 U.S.C. § 707(b).

IT IS ORDERED that the motion of the United States trustee will be granted unless within 14 days of this order debtor converts the case to a case under chapter 13.

DATED AND ENTERED June 30, 2006

William L. Edmonds, Bankruptcy Judge

8